

**SIGNED this 03rd day of March, 2011.**

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 08-11023-CAG |
| | § | |
| MOHAMMAD GHARBI and, | § | CHAPTER 7 |
| FATEMEH GHARBI, | § | |
| Debtors. | § | |

| | | |
|---|---|---|
| CENTURY 21 REAL ESTATE LLC | § | |
| Plaintiff, | § | |
| | § | ADV. NO. 08-01099-CAG |
| v. | § | |
| | § | |
| MOHAMMAD GHARBI | § | |
| Defendant. | § | |

**MEMORANDUM OPINION**

Came on to be considered the Complaint filed by Plaintiff, Century 21 Real Estate, LLC

("Plainitff" or "Century 21") on September 5, 2008, and in particular those issues left unresolved

by this Court's Order Regarding Plaintiff's Motion for Summary Judgment (docket no. 37).  The

Court held a hearing on these matters on August 26, 2010, and took the following issues under

advisement: (1) whether the Defendant Mohammad Gharbi ("Defendant")  violated 15 U.S.C. §

1125(d), and if so, (2) the amount of damages to be awarded, and (3) whether that award will be held nondischargeable under 11 U.S.C. § 523(a)(6). For the reasons stated herein, the Court finds that the relief requested by the Plaintiff should be GRANTED.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (I) on which this Court can enter a final judgment. This matter is referred to the Court under the District's Standing Order of Reference. Venue is proper under 28 U.S.C. §§ 1408 and 1409. The following represents the Court's findings of fact and conclusions of law made pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

## BACKGROUND

Beginning in 1999, the Defendant Mohammad Gharbi ("Defendant") operated a real estate business called "Capital Team" as a franchisee of Century 21 ("Plaintiff") pursuant to three Century 21 Real Estate Franchise Agreements ("Franchise Agreements"). (Iuliano Aff. ¶ 12.) One agreement was for a franchise located at 906 Chestnut, Bastrop, Texas (the "Bastrop Franchise Agreement"); another was for a franchise located at 1600 S. Pleasant Ave., Austin, Texas (the "Austin Franchise Agreement"); and a final agreement was for a franchise located at 8108 Mesa Drive, Austin, Texas (the "Mesa Drive Franchise Agreement"). Section 11(c)(vii) of the Franchise Agreements gave the Defendant a limited right to use the Century 21 mark as long as the Franchise Agreements were fully performed. (Iuliano Aff. Exhibit A, B, and C.) Section 17 of each of the Franchise Agreements gave Century 21 the right to terminate the License Agreements at any time. (Iuliano Aff. ¶ 16.) Section 18(C) of the Franchise Agreements specifies that in the case of termination the Defendant must discontinue the use of all Century 21 marks. (Iuliano Aff. ¶ 17.)

In 2005, Defendant failed to pay amounts due under the Franchise Agreements. (Iuliano Aff. ¶ 21.) A Termination Notice, dated October 28, 2005, notified the Defendant of the defaults and termination of the Defendant's rights pursuant to the Franchise Agreements. The termination was effective as of October 26, 2005. (Iuliano Aff. ¶ 22.)

After termination of the Franchise Agreements, the Defendant listed in his bankruptcy schedules ownership of the websites www.texascentury21.com and www.century21online.com. (Iuliano Aff. ¶ 26.) A third website, www.texasproperties.com/century21capitalteam was later discovered. (Iuliano Aff. ¶ 27.) Additionally, a fourth website, www.austinhomeland.com, displayed the Century 21 mark until at least July 13, 2006. The Defendant also left a Century 21 sign outside 1600 South Pleasant Valley, Austin, Texas, a piece of property listed as part of the Austin Franchise Agreement. (Iuliano Aff. ¶ 28.)

On April 26, 2010, this Court entered an Order Regarding Plaintiff's Motion for Summary Judgment (docket no. 37), granting in part and denying in part Plaintiff's Motion for Summary Judgment. On August 26, 2010, the Court held a hearing on the remaining issues in this adversary proceeding.

### SUMMARY OF TESTIMONY AND RELEVANT EVIDENCE

At trial, Plaintiff offered testimony from Robert Suggs, a representative of Amerisale, a company that designs and hosts websites. Mr. Suggs testified that he met with Defendant in 1996, and that the two of them discussed Defendant's building an online presence for his real estate business. Amerisale designed web pages for Defendant's three Century 21 franchises, and continued to host the websites through 2007. Shortly after the meeting in 1996, Amerisale developed technology that allowed Defendant to make changes to the website directly, and from that point forward, Defendant had the power to make changes to the content of his website. Mr.

3

Suggs testified that Defendant did inform him that Defendant's Century 21 franchise was eventually terminated, but he does not recall when he received that information.

After learning of Plaintiff's termination of the franchise agreement, Mr. Suggs sent a letter to Defendant, informing him that Defendant's websites continued to use Century 21 trademarks and names, which Defendant no longer had a right to do (Pl.'s Ex. 15). Mr. Suggs testified that he cannot make changes to any of his clients' websites without their permission, and because of that, he included an agreement for Defendant's signature authorizing Mr. Suggs to remove the web content and "turn off" Defendant's websites. Mr. Suggs testified that Defendant, upon signing the document, added a note next to the signature block reading "Do not turn off the site. Forward it to the new website." (Pl.'s Ex. 15). The purpose of this instruction, according to Mr. Suggs, was to allow the domain names that Defendant used for his Century 21 websites to serve as "pointers," which would direct users to the website of Defendant's new real estate business. The names of the old websites that Defendant wanted to use as pointers included, *inter alia*, www.century21austin.com, www.texascentury21.com, and www.texasproperties.com/century21capitalteam (i.e, the websites involved in Plaintiff's complaint). In a letter dated September 7, 2007, Mr. Suggs advised Defendant against using these domain names as pointers because they appeared to be "possible Century 21 infringements." (Pl.'s Ex. 15). Plaintiff introduced evidence that as of November 13, 2007, the www.century21austin.com website still included Century 21 marks and advertised one of Defendant's former Century 21 franchises (Pl.'s Ex. 9-X). Mr. Suggs also testified that only the owner of the domain name had the ability to move or "turn off" domain names.

During cross-examination, Mr. Suggs testified that using domain names as pointers is a common practice, meant to generate traffic on a website. Defendant attempted to challenge the

4

validity of Plaintiff's evidence, particularly Plaintiff's use of "archived" websites.[1] Defendant stated that he did all he could to remove the pictures and names from his websites and that Mr. Suggs told Defendant that he could use the domain names as pointers. Mr. Suggs denied this claim.

Defendant's daughter, Maryam Gharbi ("Ms. Gharbi"), testified that she had no power to change the content of the franchise websites, nor could she change the fact that the domain names that included the Century 21 name served as pointers to their new websites. Ms. Gharbi stated that she never asked anyone to turn off the old domain names. Ms. Gharbi also testified that only Amerisale had the ability to change file content or the domain names on the websites. Ms. Gharbi stated that the letter from Mr. Suggs alerting Defendant to the possible illegality of using the domain names as pointers was a fabrication, and the neither she nor her father had ever seen that letter before.

### PARTIES' CONTENTIONS

The Plaintiff contends Defendant's use of the Century 21 marks violates 15 U.S.C. § 1125(d). The Plaintiff requests statutory damages under § 1117(d) and attorneys' fees for the violation of § 1125(d)(1). The Plaintiff also contends that the statutory damages and attorneys' fees are non-dischargeable under Section § 523(a)(6) of the Bankruptcy Code.

The Defendant contends that the websites were owned by an independent third party called Amerisale. Defendant contends that he had no control or ownership of the websites and that they were located in the Amerisale inactive archive. In his answer to Plaintiff's complaint,

---

[1] Specifically, Plaintiff used www.archive.org's "Wayback Machine" which is "a service that allows people to visit archived versions of Web sites. Visitors to the Wayback Machine can type in a URL, select a date range, and then begin surfing on an archived version of the Web." *Internet Archive: Frequently Asked Questions*, http://www.archive.org/about/faqs.php (last visited 2/24/11).

the Defendant argues that he did not "use" the Century 21 mark in commerce because he was selling his own property.

The initial issue in this case is whether Defendant's continued use of the Century 21 marks is a violation of the Anticybersquatting Consumer Protection Act ("ACPA"). The second issue is whether Plaintiff is entitled to statutory damages under 15 U.S.C. § 1117(d) and attorneys' fees for each violation of § 1125(d)(1).[2] The third issue is whether or not the debt resulting from the violations should be discharged due to the Defendant's bankruptcy.

## LEGAL ANALYSIS

ACPA

Having already found that Defendant committed trademark infringement in violation of § 1114 and § 1125(a) of the Lanham Act, this Court must determine whether Defendant also engaged in conduct that constitutes a violation of Section 1125(d), the ACPA. Although the main purpose of the act is to prevent someone from purchasing domain names that are similar to another's trademark with the intent of selling the domain name to the trademark's rightful owner,

---

[2] The Court is aware that Plaintiff did not plead these first two issues in the initial complaint. However, Plaintiff raised these issues in Plaintiff's Motion for Summary Judgment (docket no. 24) and Plaintiff's Proposed Pre-Trial Order (docket no. 42) and argued the issues at the hearing August 26, 2010. The Federal Rules of Civil Procedure allow for situations such as this, stating:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

F.R.C.P. 15(b)(2). The Fifth Circuit holds that whether an issue has been tried with the implied consent of the parties depends on: (1) whether the parties recognized that the unpleaded issue entered the case at trial; (2) whether the evidence that supports the unpleaded issue was introduced at trial without objection; and (3) whether a finding of trial by consent prejudiced the opposing party's opportunity to respond. *United States v. Shanbaum*, 10 F.3d 305, 311-12 (5th Cir. 1994). Here, the Defendant recognized the unpleaded issues by responding to them both at trial and in his response to Plaintiff's Motion for Summary Judgment (docket no. 32). The evidence supporting these issues was introduced at trial without objection. Plaintiff filed his Motion for Summary Judgment on August 3, 2009 and his Proposed Pre-Trial Order on May 25, 2010. The Court held the Trial on the Complaint on August 26, 2010. Defendant was aware of the new issues over a year before the trial and this Court therefore finds no prejudice to the Defendant. Therefore, the Court finds that despite these issues not being in the original complaint, the issues were tried by the parties' implied consent.

someone can also violate the statute by "diverting consumers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owners." *Utah Lighthouse Ministry v. Found. for Apologetic Info. and Research*, 527 F.3d 1045, 1058 (10th Cir. 2008).

Specifically, the ACPA provides that

(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person

(i) has a bad faith intent to profit from that mark…; and

(ii) registers, traffics in, or uses a domain name that—

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36."

As established in the Court's Memorandum Opinion on Plaintiff's Motion for Summary Judgment (docket no. 35), the Century 21 mark was famous at the time the Defendant's domain names were registered. Thus, the issue is whether the Defendant acted with a bad faith intent to profit. The statute contains a nonexclusive list of factors a court should consider when determining whether there is bad faith. 15 U.S.C. § 1125(d)(1)(B)(i). These factors include:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any of the domain name in connection with the bona fide offering of any goods or services;

7

(IV)   the persons bona fide noncommercial or fair use of the mark in a site accessible under the domain name

(V)   the persons' intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of the site

(VI)   the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII)   the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX)   the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

This is not an exhaustive list of factors, but rather a guide to aid the trier of fact. *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 498 (2d Cir. 2000); *E. & J. Gallo Winery v. Spider Webs Ltd.*, 129 F.Supp.2d 1033, 1044 (S.D.Tex. 2001). In *Sporty's Farm*, the Second Circuit determined the defendant acted with a bad faith intent to profit after finding that the defendant's actions satisfied several of the Section 1125(d)(1)(B)(i) factors, as well as making the determination that the defendant intended to enter into direct competition with the plaintiff. 202 F.3d at 499.

8

In a Fourth Circuit case, the court held that registration of the domain name "peta.org" by the defendant was a violation of § 1125(d) because it infringed upon the rights of People for the Ethical Treatment of Animals. ***People for the Ethical Treatment of Animals v. Doughney***, 263 F.3d 359 (4th Cir. 2001). In making the determination that the defendant acted with a bad faith intent to profit, the court considered, *inter alia*, the following facts: (1) the defendant had no intellectual property right in "peta.org"; (2) the name "peta.org" bore no resemblance to the defendant's actual name or any word associated with the defendant; (3) the defendant was not using "peta.org" to offer any bona fide goods or services; (4) the defendant used the domain name in a "commercial manner"; and (5) the defendant "clearly intended to confuse, mislead, or divert internet users…" ***Id.*** at 369.

In ***Gallo Winery***, the court concluded that because the defendant had no intellectual property interest in the domain name "ERNESTANDJULIOGALLO.COM," and because the domain name bore no resemblance to the defendant Spider Webs Ltd., the defendant had a bad faith intent sufficient to satisfy the bad faith requirement of the ACPA. 129 F.Supp.2d at 1045.

Defendant's case is distinguishable from the above cases in that at the time of the domain name registration, Defendant had the right to use the trademarked name, whereas the cases discussed above involve defendants that registered the domain name with the intent to profit *at the time of registration*. Here, Defendant did not register the domain name in violation of the ACPA. Instead, it is Defendant's use of the websites after the termination of the Franchise Agreements that is at issue. The cases discussed above are still analogous to the present case because they involve defendants using a famous name without permission from the trademark holder – the exact fact pattern of this case.

In the instant case, the evidence suggests that Defendant did not have any intellectual property rights in the domain name (factor I). At one time, in accordance with the Franchise Agreements, Defendant was granted a license to use Plaintiff's marks, including a domain name that contained the Century 21 name (factor III). However, the termination of the franchise agreement revoked the license and the notice of termination operated as ample notice that through the termination of the franchise agreement, Defendant no longer had permission to use the marks (factor IV). Further, as this Court's Memorandum Opinion (docket no. 35) indicated, the domain names "www.century21austin.com," "www.texascentury21.com," and "www.texasproperties.com/century21capitalteam" make ample use of the name "Century 21." Although Defendant did, at one point, use the domain name in a bona fide offering of services, Defendant lost permission to do so in connection with Plaintiff's business, and Defendant's use of the mark for commercial purposes after the termination of the agreement was to offer services for his new business, Zip Code Real Estate Services (factor V).

The evidence adduced at trial shows that Defendant acted with the intent to divert consumers from Century 21's online locations (through the use of the websites) to Defendant's new place of business for the purpose of commercial gain. Mr. Suggs testified that Defendant asked about the advisability of using Century 21 names as "pointers" to lead to his website. Mr. Suggs stated that he advised Defendant against the idea and recommended that the domain names be turned off. Defendant, however, provided written instructions to Mr. Suggs not to turn off the domain names, but rather to use those domain names as pointers to Defendant's new website. Defendant testified that the handwriting on these instructions was not his, but the Court does not find this testimony compelling. Defendant's conduct suggests a clear intent from Defendant to use the Century 21 name to direct traffic to his new business for commercial gain.

Accordingly, after hearing the arguments of both parties, there is ample evidence to find that Defendant had a bad faith intent to profit in regard to the use of the domain names in question.

Section 1125(d)(B)(ii) contains a safe harbor provision by providing that "[b]ad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."

Here, it is undisputed that the Defendant had the right to use the Century 21 mark in his company's domain names prior to the termination of the franchise agreements. Once the Defendant received the Termination Notice, however, he was on notice that he no longer had lawful or fair use of the Century 21 mark. Therefore, the "safe harbor" provision is inapplicable in this case.

Finally, because Century 21 is a trademarked name, Defendant's use of Century 21 in a domain name satisfies the requirement of Section 1125(d)(1)(A)(ii)(III).

Because this Court finds that Defendant had a bad faith intent to profit from the use of a trademarked name, Defendant's use of the three domain names after the termination agreement constituted a violation of Section 1125(d).

Damages

Plaintiff requested statutory damages under Section 1117(d) and attorneys' fees. Section 1117(d) only applies to violations under Section 1125(d), the Anticybersquatting Consumer Protection Act. Plaintiff chose to elect damages under this section, as opposed to damages for Defendant's violations of Sections 1114(1)(a) and 1125(a). In the Court's Memorandum Opinion on Plaintiff's Motion for Summary Judgment, the Court determined that Defendant violated 15 U.S.C. §§ 1114(1)(a) and 1125(a). Both of those sections point to Section 1117(a),

which entitles the plaintiff to recover defendant's profits, any damages sustained by the plaintiff, and the costs of the action. Defendant never supplied the Court or Plaintiff detailed records which could be used to fashion a monetary reward.[3] Therefore, Plaintiff chose to seek statutory damages for the violation of § 1125(d)(1) as authorized by § 1117(d).[4]

Because the Court did not reach this issue in its Memorandum Opinion on Plaintiff's Motion for Summary Judgment, the issue was argued at the trial on August 26, 2010. Specifically, Section 1117(d) states, "In a case involving §1125(d)(1) of this title, the plaintiff may elect . . . to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the Court considers just."

Plaintiff is seeking a final judgment in the amount of $300,000, or $100,000 per infringing website. Plaintiff seeks the statutory maximum due to Defendant's "flagrant and unauthorized use of the famous Century 21 Marks, as well as the Defendant's willful frustration of Century's 21 [sic] rights to calculate more specific monetary damages under Section 1117(a) and (b)" (docket no. 24). The Court is given little by way of guideposts in determining what justice requires here. The District Court for the Southern District of New York awarded a plaintiff the statutory minimum of $1,000 per violation under § 1117(d), stating that "[t]he need for deterrence is not exceptional in this case since little if any actual harm has been done to [plaintiff], considering the miniscule number of web hits and the solitary sale of a pair of stockings." *Mattel Inc. v. Adventure Apparel*, 2001 WL 1035140, *5 (S.D.N.Y. Sept. 7, 2001).

---

[3] Defendant stated that the records were destroyed as part of an act of vandalism. However, the Court does not find this persuasive as it is not the fault of the Plaintiff that Defendant allegedly chose to keep only one copy of records and store these in a less-than-secure place.

[4] While some courts have allowed a plaintiff to recover under both 1117(a) and 1117(d), Plaintiff elected to only pursue damages under Section 1117(d), stating that the financial records that could be used by the Court to determine damages under Section 1117(a) are unreliable.

In contrast, the Eastern District of Pennsylvania awarded a plaintiff the statutory maximum of $100,000 per violation because the defendant had been previously enjoined from similar cybersquatting conduct and stated that the defendant "boldly thumbs his nose at the rulings of this court and the laws of our country. Therefore I find that justice in this case requires that damages be assessed against [defendant] in the amount of $100,000 per infringing domain name…" *Electronics Boutique Holdings Corp. v. Zuccarini*, 2000 WL 1622760, *8 (E.D.Pa. Oct. 30, 2000). The Fifth Circuit, in upholding an award for the statutory maximum determined that $100,000 per violation was warranted "in light of [defendant's] bad faith intent to divert potential customers to [defendant's] website and because [plaintiff] is a direct competitor of [defendant] in Dallas," and because "the [defendants] had refused to stop forwarding the infringing domain names or to transfer them to [plaintiff] until just a few weeks before trial." *Kiva Kitchen & Bath Inc. v. Capital Distributing Inc.*, 319 F.App'x 316, 320-21 (5th Cir. 2009). Those infringing domain names specifically contained the plaintiff's names in the websites. *Id.* However, for the domain names without the plaintiff's mark, the district court chose to award the plaintiffs $10,000, "noting that the other stores-which are not located in the Dallas area-do not directly compete with [the defendant]." *Id.* at 321.

A review of the case law shows that this Court has wide discretion in determining the amount of statutory damages to award. The Fifth Circuit has stated that the statutory damage provisions of ACPA are akin to the statutory damages provisions of the copyright laws, which the Supreme Court has said "not merely compel[] restitution of profit and reparation for injury but also [are] designed to discourage wrongful conduct." *E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 278 (5th Cir. 2002) (quoting *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233 (1952)). The Ninth Circuit has stated that the policy behind Section 1117

13

damages is to "take all economic incentive out of trademark infringement." *Harry and David v. Pathak*, 2010 WL 4955780, *5 (D.Or. Oct. 29, 2010) (quoting *Intel Corp. v. Terabyte Int'l Inc.*, 6 F.3d 614, 621 (9th Cir. 1993)). A District Court in California discussed several factors to take into consideration when determining the amount to award a plaintiff under § 1117(d). *Verizon California Inc. v. Onlinenic, Inc.*, 2009 WL 2706393 (N.D.Cal. August 25, 2009). Those factors include the egregiousness or willfulness of the cybersquatting conduct, the use of false contact information to conceal its infringing activities, the patterns of infringing conduct by the defendant, and other behavior by the defendant showing an attitude of contempt towards the court or the proceedings. *Id.* at *3-6.

The Defendant in this case at one time had the rights to use the websites. Once he lost the rights, Defendant continued using the sites, despite being asked to take them down by Plaintiff and being told by Mr. Suggs that his conduct could be illegal. While clearly wrong and intentional, the Court does not believe that Defendant's conduct rises to the level to warrant an award of the statutory maximum. The Court therefore finds that an award of $25,000 per violation, or $75,000 total, is just. *See, e.g., E & J Gallo Winery*, 286 F.3d at 278 (upholding the district court's award of $25,000 in statutory damages when the plaintiff in the case did not present any evidence that it lost any business due to the defendant's actions, but was at risk of losing business and of having its reputation tarnished).

Plaintiff also seeks an award of attorneys' fees. Reasonable attorneys' fees are allowed for violations of the ACPA under Section 1117(a) in "exceptional cases." The Fifth Circuit described an exceptional case as one that "involves acts that can be called 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.'" *Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distrib. Co., Inc.*, 520 F.3d 393, 402 (5th Cir. 2008) (citing *Seven-Up Co. v. Coca-Cola Co.*, 86

14

F.3d 1379, 1390 (5th Cir. 1996)). In making the determination that Defendant violated the ACPA, the Court holds that Defendant acted with the bad faith intent to profit from Plaintiff's marks. Additionally, the testimony of Mr. Suggs shows that Defendant knew that what he was doing was wrong and Defendant was previously told by the Plaintiff to cease using the marks. Defendant acted willfully in choosing to keep the websites at issue in operation and to use them as pointers to his new website. The Court therefore finds that Defendant's conduct renders this an exceptional case and Plaintiff is entitled to reasonable attorneys' fees, to be determined through supporting affidavits and records pursuant to Federal Rule of Bankruptcy Procedure 7054 and Local Rule 7054.

<u>Dischargeability</u>

Plaintiff argues that the damages and attorneys' fees awarded above should be held non-dischargeable under Section 523(a)(6) of the Bankruptcy Code. In order for a debt to be deemed nondischargeable, the Plaintiff must demonstrate a "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The Court has previously disagreed with the Plaintiff's contention that a finding of bad faith under 15 U.S.C. § 1125(d) demonstrates a "willful and malicious injury" for the purposes of § 523(a)(6) (docket no. 35). For the act to be willful and malicious "a debtor must have acted with 'objective substantial certainty or subjective motive' to inflict injury." ***In re Williams***, 337 F.3d 504, 508-09 (5th Cir. 2003) (citing ***In re Miller***, 156 F.3d 598, 603 (5th Cir. 1998)). Whether the acts were substantially certain to cause injury (the "objective test") is based on "whether the defendant's actions, which from a reasonable person's standpoint were substantially certain to result in harm, are such that the court ought to infer that the debtor's *subjective* intent was to inflict a willful and malicious injury on the plaintiff." ***In re Powers***, 421 B.R. 326, 335 (Bankr. W.D.Tex. 2009)

15

(emphasis in original).  A subjective motive to cause harm (the "subjective test") exists when a tortfeasor acts "deliberately and intentionally, in knowing disregard of the rights of another." *See In re Miller*, 156 F.3d at 605-06 (adopting the definition of "implied malice" from *In re Nance*, 566 F.2d 602, 611 (1st Cir. 1977)).

The Supreme Court has determined that the word "willful" under Section 523(a)(6) modifies the word "injury," indicating that a finding of nondischargeability requires a deliberate or intentional injury, not merely a deliberate act that results in injury.  *Kawaauhua v. Geiger*, 523 U.S. 57, 61 (1998).  In defining the term "malicious" under Section 523(a)(6), the Fifth Circuit holds that it means "implied malice," as opposed to "special malice."  *In re Miller*, 156 F.3d at 605.  "Implied malice" means "acts done with the actual intent to cause injury," whereas "special malice" requires a showing of a motive to harm.  *Id.*  The Fifth Circuit, in recognizing that the definition of implied malice is the same standard used by the Supreme Court for "willful injury," held that a finding of implied malice can render a debt nondischargeable under Section 523(a)(6).  *Id.* (discussing *Kawaauhua*, 523 U.S. 57).

As previously discussed, the Defendant had the right to use the offending domain names under the conditions of the Franchise Agreements and that right was terminated by Plaintiff's termination of the Franchise Agreements.  *See* (Plaintiff's Exs. 5-7).  Defendant continued to allow each of the websites to remain operational for at least one year after the date of the termination.  Furthermore, Defendant took direct action that caused the websites to remain operational.  Mr. Suggs testified that he told the Defendant that continuing to leave the websites operational could result in legal trouble for the Defendant.  The Defendant ignored these warnings and signed a statement that specifically directed "[d]o not turn off the site.  Forward it to the new website." (Plaintiff's Ex. 15).

16

The Defendant's conduct was willful and malicious under both the objective and the subjective standards laid down by the Fifth Circuit. First, there is an objective substantial certainty that the Defendant's actions would cause harm to the Plaintiff. Under the objective standard, the Court concludes that the Defendant knew that he would cause harm to the Plaintiff if he continued to operate the websites. On September 7, 2007, Mr. Suggs sent the Defendant a letter that stated "[s]ome of the domains appear to be possible Century 21 infringements[.] I cannot advise you to use them. If I were you I would be reluctant to use them even as a pointer." (Plaintiff's Ex. 15). The Defendant's letter directed Mr. Suggs to continue using the site as a pointer by saying "[f]orward it to the new website." (*Id.*) Defendant's desire to continue using the websites bearing Plaintiff's names implies that Defendant believed the websites were still attracting visitors, and Defendant wished to use that web traffic to gain more traffic to Defendant's new website. This new website that the visitors were directed to was a commercial website that was operating to create profits for the Defendant. The visitors that were directed there may have actually intended to do business with a licensed Century 21 franchise. Therefore, Defendant could have potentially appropriated business from Plaintiff by using the marks Defendant no longer had the right to use. It is for this reason, *inter alia*, that the Court has already made the determination that Defendant violated the ACPA. Based on the conduct of the Defendant and the evidence presented at trial, the Court finds that there was an objective substantial certainty of harm from Defendant's actions.[5]

Defendant also fails the subjective prong of the *Miller* test because he deliberately and intentionally, in knowing disregard of the rights of the Plaintiff, continued to operate the domain names. Defendant was put on notice that the Franchise Agreements with Plaintiff were

---

[5] Additionally, as established in the Court's Memorandum Opinion finding that Defendant violated Section 1114, Defendant's use of Plaintiff's marks was likely to cause confusion, or to cause mistake or to deceive.

terminated. The termination of the Franchise Agreements precluded Defendant from any further use of Plaintiff's marks. The termination of the Franchise Agreements also required Defendant to ensure that Defendant's business, C21 Capital Team, cease all use of Plaintiff's marks. Furthermore, Defendant was also put on notice by Mr. Suggs that Defendant risked legal trouble for the continued use of the websites containing Plaintiff's marks. Thus, the Court finds that Defendant knowingly disregarded the rights of the Plaintiff in directing Mr. Suggs to leave the websites turned on.

Plaintiff met its burden to show by a preponderance of the evidence that Defendant caused Plaintiff willful and malicious injury of the type the ACPA is intended to reach. Defendant's conduct meets both the objective and subjective prong of the test established in *Miller*. Therefore, the Court holds that the attorneys' fees and damages awarded under 15 U.S.C. § 1117 are nondischargeable under Section 523(a)(6).

## CONCLUSION

Based on the foregoing, the Court finds (1) that the Defendant violated 15 U.S.C. § 1125(d); (2) that Plaintiff should be awarded $25,000 per violation, or $75,000 total, plus attorneys' fees as determined under Federal Rule of Bankruptcy Procedure 7054; and (3) that this award will be held nondischargeable under 11 U.S.C. § 523(a)(6). For the reasons stated herein, the Court finds that the relief requested by the Plaintiff should be, and hereby is, GRANTED. A separate Judgment shall be entered.

# # #